ADAMSON R. McCANLESS, assignee for the benefit of creditors of Heath & Quincey,

v.

HENRY N. SMITH, MARY E. SMITH and C. I. HUDSON & CO.

1. In a suit in equity by a judgment creditor to subject to the lien of his judgment lands held by a third party in fraudulent trust for the judgment debtor, it is not competent for the trustees to question the judgment on any ground except that it was recovered by fraudulent collusion between the plaintiff and defendant therein.

2. Such trustee cannot take advantage of any illegal quality in the consideration of the judgment, which would have constituted a good defence if set up in an action in this state.

3. A husband paid for and caused to be conveyed to his wife a tract of land upon which were a race-track and the stabling and other improvements suited thereto, together with a plain dwelling. He also caused to be conveyed to her other adjoining tracts, which he added to the race-course tract, and expended upon these lands large sums in additional stabling and barns and an expensive club-house, and placed upon the premises stallions and mares for breeding purposes, and with his wife's knowledge and acquiescence carried on there the business of breeding horses in his own name, and appeared to the outside world as the owner thereof, while the title stood on the public records in the name of his wife. At the date of the settlement, and thence almost continuously until his failure, he was operating largely upon margins upon the New York Stock Exchange.—*Held*, that subsequent creditors of the husband, who became such in reliance upon such apparent ownership, are entitled to have the lands subjected to the lien of their judgment.

4. *Semble*—that the true ground upon which creditors are entitled to set aside a settlement made by their debtor prior to the accrual of their debts, is that the debtor was permitted by the beneficiary to be and remain in the apparent ownership of the settled property, and to obtain financial credit on the strength of his apparent ownership.

5. Where a party, being in insolvent circumstances, conveys property to his wife for a consideration several times less than its value, with intent to place it beyond the reach of his creditors, a court of equity, in a suit by a judgment creditor to set aside such conveyance, will not treat it as a mortgage, but will set it aside absolutely.

Heard on bill, answer and proofs in open court.

*Mr. Joseph Cross, Mr. Richard V. Lindabury* and *Mr. Aaron P. Whitehead,* for the complainant.

*Mr. Garret D. W. Vroom, Mr. Barker Gummere, Mr. William S. Gummere* and *Mr. Elihu Root* (of New York), for H. N. Smith and the devisees of Mary E. Smith.

*Mr. William M. Lanning,* for C. I. Hudson & Co.

PITNEY, V. C.

The complainant is a judgment creditor of the defendant Henry N. Smith. The object of his bill is to subject to the lien of his judgment certain lands which, at the date of its entry, stood in the name of the defendant Mary E. Smith.

After the defendants had answered (the said Henry N. Smith and Mary E. Smith answering separately), Mary E. Smith died testate, and her devisees, including three infant children, were made parties defendant in her place.

The lands in question comprise what is known as the "Fashion Stud Farm," near Trenton, New Jersey, containing about three hundred and seventy acres of land. This tract was composed originally of twelve smaller tracts. To five of these Mrs. Smith acquired title by five separate conveyances from five different owners, dated at different dates between the 5th of April, 1872, and the 7th of April, 1873. These five tracts comprise, in their aggregate, one hundred and thirty-six acres and thirty-eight hundredths of an acre. The remaining seven tracts were conveyed to her by her husband, Henry N. Smith, through their son, Everett L. Smith, as a conduit, by deed dated 21st of July, 1885.

The bill sets out an assignment made by Heath & Quincey on the 2d of October, 1885, to the complainant, of all their property of every nature, except such as was exempt by law from levy and sale under execution, in trust for the benefit of their creditors; and further, that among the assets so assigned was a

McCanless v. Smith.

claim against the defendant Smith, upon which the complainant recovered judgment in the supreme court of the State of New York on the 7th of July, 1886, for the sum of $906,236.97, damages and costs, and that upon that judgment suit was brought and judgment recovered in the supreme court of the State of New Jersey on the 4th day of June, 1887, for the sum of $955,576.80.

The bill sets out the several executions issued upon this judgment, and a levy, among other lands, upon the lands just mentioned.

The bill alleges that the consideration for the several conveyances to Mrs. Smith of the five tracts which were conveyed to her in 1872 and 1873 was paid by Smith, and that although a consideration of $46,073.75 is mentioned in the deed from Smith to his wife of July 1st, 1885, yet, in fact, nothing was paid by Mrs. Smith to her husband for that conveyance, and that the twelve tracts lie together and compose what is known as the "Fashion Stud Farm," and that at and before the original purchases of 1872 and 1873, and from that time until the month of October, 1885, Smith was engaged in speculating in stocks, bonds and other securities dealt in at the stock exchange in the city of New York, such speculations consisting mainly in selling "short" by Smith of such securities as he thought likely to fall in market price, with the expectation that he could buy the said stocks for delivery to the purchaser thereof at a lower price than he had sold them at, and make the difference between the price at which he bought and the price at which he sold the stocks; and that he also speculated in and bought and sold the commodities dealt in on the produce and petroleum exchanges in New York, by means of what are termed "futures" and "options;" that said speculations were carried on by Smith during that period on a large scale and to the extent of many millions of dollars, and that his profits depended mainly upon a fall in the market price of such securities and commodities, and that any great or permanent rise in such prices was liable at any moment to wipe out his profits as well as his capital, and render him insolvent and unable to meet his engagements; and that his capi-

tal and profits during the whole of the period mentioned consisted almost wholly of balances standing to his credit on the books of stock brokers and others in the city of New York, which were liable to be wiped out and extinguished by any considerable fluctuation in the price of the different articles speculated in.

The bill further alleges that Smith spent large amounts of money in various improvements upon the Fashion Stud Farm, amounting to several hundred thousand dollars, and that all the moneys so spent on the premises were his own moneys, and that he used the premises for the purpose of carrying on the business of raising and selling colts, fillies, horses, mares and other stock, and that he carried on that business on a very extensive scale, and has continued it down to the time of the filing of the bill, and that he invested very large sums of money in it, aggregating half a million dollars, and that the business so carried on was his business and not his wife's.

The bill further alleges that the five tracts of land originally purchased by Smith, of which the title was placed in the name of his wife,

" were so taken on account of the hazardous nature of the business in which he was engaged as aforesaid, and in anticipation of the contraction of debts therein which he would be unable to pay, and with a view thereby to place and hold them beyond the reach of his creditors, and that they have always been held by the said Mary E. Smith in trust for the said Henry N. Smith, and have been occupied, used and enjoyed by him, and are now occupied, used and enjoyed by him, as his own property."

The bill further alleges that the complainant's judgment was recovered on a balance of account due from Smith to Heath & Quincey, arising out of the stock transactions of Smith; that Heath & Quincey were stock brokers doing business on Wall street, in the city of New York, and were brokers for Smith in said stock transactions for a period of four or five years before the assignment of October 2d, 1885, and that, in such business, Heath & Quincey made large advances and loans, and sales of stocks and securities, to Smith, and incurred various liabilities

on his account and at his request, and performed sundry valuable services for him, on account of which he became indebted to them for salaries and commissions in various large sums, and that said balance of account upon which said judgment was recovered was made up of the balance due upon such loans, advances, sales, commissions &c., together with interest.

The bill further alleges that, during the time in which the liabilities just mentioned were incurred by Smith to Heath & Quincey, Smith, with the knowledge and consent of his wife, gave out and represented on all occasions that he was the owner and proprietor of the Fashion Stud Farm, especially represent-ing it to Heath & Quincey, and that it was generally understood and believed among and by the various firms in the city of New York and elsewhere with whom Smith was dealing, and espe-cially understood and believed by Heath & Quincey, that he was the owner of the Fashion Stud Farm, and that, in dealing with him and giving him credit, Heath & Quincey relied upon their belief that he was the owner thereof and that the same would be assets or security to which they would be entitled to resort in the event of the suspension of payment or other pecuniary embarrassment of Smith, and that Heath & Quincey made said advancements and incurred said liability and performed such services on the said representation of Smith and the belief aforesaid.

The bill further alleges that Smith was insolvent at the time he made the conveyance of July 21st, 1885, and that that con-veyance was made for the purpose of hindering and delaying his creditors, including Heath & Quincey.

The prayer is that the five tracts conveyed in 1872 and 1873 to Mrs. Smith may be decreed to be held in trust by her for the use and benefit of her husband, Henry N. Smith, and that the conveyance by Smith to his wife, of July 21st, 1885, may be declared to be fraudulent and void and set aside in favor of the complainant, and all the lands subjected to the lien of his judgment.

Mrs. Smith, by her separate answer, alleges that in 1872 and 1873, when the first five tracts of land were conveyed to her,

McCanless v. Smith.

her husband was unembarrassed and did not owe Heath & Quincey anything, and that he was then minded and proposed to this defendant to give to and settle upon her certain lands in the county of Mercer and State of New Jersey, and that she, knowing him to be a man of large wealth, accepted his proposal, and thereupon the five several conveyances were immediately put upon the public records, and that Heath & Quincey had notice thereof by their record; and she alleges that the conveyances were not made or contrived in fraud, covin or collusion, with intent to hinder, delay or defraud Heath & Quincey or any other creditors of her husband, but that the said transaction was a *bona fide* and lawful gift and settlement of the said lands upon her.

The answer further sets out with regard to the seven tracts of land conveyed to Mrs. Smith July 21st, 1885, that they were so conveyed for a full and valuable consideration, which is set out in this wise: that on the 28th of September, 1869, her husband, Henry N. Smith, being then possessed of an estate of at least $500,000 over and above all his debts and liabilities, gave and settled upon her a leasehold estate in certain lands situate on the south side of Forty-third street, between Fifth and Sixth avenues, in the city of New York, and caused such estate to be assigned to and vested in her by certain assignments of lease, one made and executed by Helen Day Gould and the other by William F. Smith, and that her husband paid the said Helen Day Gould and William F. Smith the purchase-money and consideration for those assignments; and she says that such assignments were not made or contrived in fraud, covin or collusion, with intent to hinder, delay or defraud any creditor, but constituted a *bona fide* and lawful gift and settlement of the said leaseholds to and upon her; and she says that she held said leasehold estate until the 16th day of July, 1883, at which time the said leasehold estate was of the value of at least $45,000, and on that day her husband, who was at that time the holder of the leasehold estate in certain lands adjoining the leasehold of Mrs. Smith, proposed to her to vest her leasehold estate in him,

McCanless v. Smith.

"and promised this defendant that if she would execute the necessary instruments to accomplish that purpose, he would account to her for the value of her said leasehold estate, and would pay her the value thereof or would vest in her the title to other lands of a value equal to that of her said leasehold estate,"

and that such leasehold consisted of an unexpired term of seventeen years, with the right of two renewals of the lease, for the term of twenty-one years each; and that, confiding in that promise, she surrendered the lease to the original lessors, in order to enable her husband to receive a new lease, which he did, and that he thereafter enjoyed the benefit of it and never paid her any consideration for it.

She further says that, on the 25th of July, 1883, her husband acquired the freehold of a house and lot on the east side of Fifth avenue, near Forty-fifth street, in the city of New York, for the consideration of $60,000, in which she was entitled to an inchoate right of dower, and that, in July, 1885, her husband asked her to join him in the execution of a mortgage to Heath & Quincey upon, and to release to them, her inchoate right of dower in the house on Fifth avenue, in order to enable him to secure Heath & Quincey for whatever moneys he might owe them; whereupon she advised with counsel, and after such advice she, by her counsel, informed her husband that she would not join in the execution of the mortgage unless Smith would pay over to her the value of the leasehold premises which she had released to him two years previously, or would convey to her the seven tracts of land in Mercer county, in payment of the debts he owed her for the leasehold surrender of 1883; and she alleges the value of her leasehold estate which she had previously surrendered, with interest thereon, and her inchoate right of dower, was at least the sum of $46,073.75; and it was thereupon agreed between her and her husband that he should convey to her the several tracts at Trenton, and he made the conveyance accordingly; and that she at the same time joined with him in a mortgage to Heath & Quincey on the house on Fifth avenue, bearing date the 20th day of July, 1885; and so she says that the conveyance of the seven tracts to her in July,

1885, was made upon a full consideration, without any intent to hinder, delay or defraud creditors.

She alleges that as soon as she obtained the conveyance of the first five tracts in 1872, she commenced the business of breeding and selling stock and using the said lands as a stock farm, and that she has ever since continued the same business upon the same lands upon her own account, and has ever since resided upon the said stock farm a considerable part of each year, and that she has had exclusive possession thereof, and has taken and received to her own separate use the rents, issues and profits thereof, and that her said husband has never had any possession of the said stock farm other than as her husband living with her thereon and aiding her in the management thereof.

She denies that she ever authorized her husband to make any representations to anybody that he was the owner of these lands.

She admits that shortly after the vesting of the title in her in 1872 and 1873, several buildings were erected and constructed upon the farm, but that all of said buildings were erected pursuant to contracts made by her with the several materialmen and builders thereof, and that a considerable amount of fencing was also erected upon the said farm ; and she says that the materials and work done in the said buildings and fencing were paid for from the receipts of the farm, and the deficiency was paid for by Smith and was a voluntary gift by him to her, and that at the time of making said improvements Smith was possessed of an estate of over $1,000,000 over and above all his debts and liabilities, and that all the improvements were made many years before Smith became indebted to Heath & Quincey.

Smith's answer is an echo of that of his wife. He says that in 1872 he was worth $1,000,000 over and above all his liabilities, and being so minded he did procure a conveyance of the five tracts above mentioned to be made to his wife as a gift and settlement upon her, and that the said transaction was a *bona fide* and lawful gift and settlement upon his said wife.

He repeats the statement contained in his wife's answer with regard to the acquisition by her of the leasehold estate in lands situate on the southeast side of Forty-third street, between Fifth

McCanless v. Smith.

and Sixth avenues, purchased from Mrs. Gould and William F. Smith; and he says that the transaction was a *bona fide* and lawful gift and settlement of the said leasehold to and upon his wife.

He further says that in 1883 he was the owner of a leasehold estate in lands adjoining those of his wife on Forty-third street, and being desirous of uniting the titles and building a single house upon the property, he proposed to his wife that she should vest her leasehold estate in him,

"and this defendant then and there promised his said wife that if she would execute the necessary instruments to accomplish that purpose, he, this defendant, would account to her for the value of her said leasehold estate, and would pay her the value thereof, or that he would vest in her the title in other lands of a value equal to that of her leasehold estate."

He also sets out the purchase of the house and lot in his own name on Fifth avenue in July, 1883, and the desire to mortgage it to Heath & Quincey in July, 1885, and that he asked his wife to join with him in the mortgage in order to release her inchoate right of dower, and that she consulted counsel and then declined to join in the execution of the mortgage unless he would pay her the value of the leasehold premises and the value of her estate in dower, or convey to her the seven tracts which he owned adjacent to her five tracts in Trenton, and that he agreed to convey the seven tracts in payment of what he owed her for the leasehold and her inchoate right of dower; and he says that the actual value of the leasehold estate of his wife, with interest thereon from the 16th day of July, 1883, and her inchoate right of dower, was at least the sum of $46,073.71.

He admits that at times between 1872 and 1885 he did deal in and was engaged in speculating in stocks, bonds and other securities dealt in at the stock exchange in the city of New York, but denies that his speculations consisted mainly in selling "short," but that his interests were more often on the "long" side of the market than on the "short." And he says that at times during the period in question he had no speculations whatever in stocks, and had moneys and securities actually in his

33

possession to a large amount, aggregating many millions of dollars, upon which he did not owe anything; and he denies that during all that period in question his profits depended either upon a fall or a rise in the market price of securities, and denies that at all times during that period his capital and profits consisted almost wholly of balances standing to his credit on the books of stock brokers and others in the city of New York, and insists that there were times during the said period in which all his speculative interests were closed, and he was possessed of stocks and securities actually paid for and in possession, and his income consisted of interest upon his moneys loaned or on deposit, and in dividends upon his securities.

With regard to the several tracts of land at Trenton, he denies that the seven tracts purchased by him were in fact added to the Fashion Stud Farm, and says that he was not the owner of the tracts constituting the "Fashion Stud Farm," and he says that at the time he purchased the seven tracts conveyed to him, he purposed to improve a large portion of the same in a manner entirely distinct from, and having no connection whatever with, the said Fashion Stud Farm, and that until prepared to make the improvements designed by him on those lands, he permitted a portion of them to be cultivated and used by the "Fashion Stud Farm." He admits the making of improvements, but says that all were made by his wife, Mary E. Smith, in pursuance of contracts made and executed by her with the several material-men and builders; and he says that the proceeds of the Fashion Stud Farm were used by his wife for the payment of improvements so far as they would go, but that any balance necessary to meet the payments therefor, over and above such receipts or proceeds, were paid by him to his wife, and that said payments were made many years before he became indebted to Heath & Quincey, and at a time when he was worth a million of dollars.

He denies that he was ever engaged in the business of raising and selling colts, fillies, horses, mares and other stock upon the farm, but says that the business was carried on by his wife under the name of the "Fashion Stud Farm," and that her moneys have always been used in the business; that no moneys have been

McCanless *v.* Smith.

invested by him in the business, and no moneys paid by him except such as were a voluntary gift to his wife.

He admits that the complainant's judgment was recovered upon a balance of account due from him to Heath & Quincey; and he admits that Heath & Quincey were stock brokers doing business on Wall street, in New York, and had been his brokers in stock transactions for a period of four or five years before the assignment of Heath & Quincey to complainant, "and that the judgment recovered against this defendant was made up of the *balance due upon loans, advances, sales, commissions &c., with interest thereon.*"

He denies that he ever represented himself to Heath & Quincey to be the owner of the Fashion Stud Farm, but alleges that they well knew that the same was the property of his wife and had been her property for many years; and he denies that Heath & Quincey relied at all upon his supposed ownership of that property.

Upon the issues thus made up, the cause was brought to hearing, and a mass of evidence, oral and written, produced in support of the issues on both sides.

At the argument, the point was made on behalf of defendants that the court ought not to aid the complainant to enforce his judgment against the lands because it appeared that it was founded upon a debt arising out of gambling transactions such as received the disapprobation of the court of errors and appeals in *Flagg* v. *Baldwin, 11 Stew. Eq. 219,* and it was urged with much force that, although the complainant had obtained a judgment in the supreme court of this state for the amount of his claim, yet that if it appeared that it was, in fact, based upon such a foundation, it was competent for the devisees of Mrs. Smith, who were not parties to that judgment, to set up the vice in question as an equitable bar.

Several objections to this position were taken by the counsel of the complainant, and as it lies at the foundation of complainant's standing in this court, I think it proper to consider it at the start.

In the first place, although it is alleged in the bill that the

complainant's judgment in this state was based upon the previous judgment recovered in the supreme court of the State of New York, and that that judgment was based upon a balance of account due Heath & Quincey from Smith, arising out of stock transactions, in which

"Heath & Quincey made large advances and loans, and sales of stocks and securities, to Smith, and incurred various liabilities on his account and at his request, and performed sundry services for him on account of which he became indebted to them for services and commissions in various large sums, and that the balance of account upon which the judgment was recovered was made up of *the balance due upon such loans, advances, sales, commissions &c., with interest,*"

yet the defendant Mrs. Smith made no allegation in her answer that the basic transactions were unlawful. She, in fact, neither admits nor denies the allegations of the bill just referred to; but the defendant Smith, by his answer, admits this allegation of the bill in these words, "and that the judgment recovered against this defendant was made up of the balance due upon loans, advances, sales, commissions &c., with interest thereon."

It thus appears that the question whether the judgment was, in fact, based upon transactions of the same character as those under review in *Flagg* v. *Baldwin,* was not raised by the pleadings, and was not put in issue. The proof was here, as in *Flagg* v. *Baldwin,* that in all instances where stocks were ordered to be bought or sold, they were, in point of fact, actually transferred and delivered, one way or the other, in accordance with the orders of Mr. Smith. Both Mr. McCanless and Mr. Quincey testify to this in the most positive manner, and there was no evidence to the contrary. On the other hand, there is no evidence that there was any understanding between Smith and his brokers that there were to be no deliveries of the stock as between him and them, such as was sworn to by Flagg in the case of *Flagg* v. *Baldwin.* It is stated in the opinion (*11 Stew. Eq. 232*) that Flagg swore, in that case, that it was expressly understood that there were not to be any actual deliveries of stock and that he should not be required to pay for them. In the absence of such express proof, I do not feel called upon to

presume that the transactions between Smith and his brokers were precisely the same as those between Flagg and his brokers, which were declared unlawful in *Flagg* v. *Baldwin*. It is, however, manifest from the whole case that the general transactions between Smith and his brokers were very much of the same character as those between Flagg and his brokers, in the case referred to.

In the next place, the judgment-roll of the judgment in New York was exhibited, and its examination shows that it was a judgment for deficiency in an action for the foreclosure of the mortgage given by Smith and his wife to Heath & Quincey, upon the Fifth avenue house, which is referred to in the pleadings. The suit was brought in the supreme court of New York by the complainant, McCanless, as assignee of Heath & Quincey, against Henry N. Smith and Mary E. Smith, his wife, and John T. Cumming, assignee of Henry N. Smith, and two other persons; and it sets out that, during the years 1882, 1883, 1884 and 1885 the defendant Henry N. Smith employed Heath & Quincey to buy and sell and borrow stocks and other securities for his account, upon the usual commissions, and Heath & Quincey, by the authority and direction of Smith, from time to time bought, sold and borrowed stocks and other securities, as bankers and stock brokers, on commission, for Smith's account, and in the course of such purchases and sales, and for said borrowed stock, *paid and laid out and expended large sums of money, at the request and for the account of said Smith, and said Smith became indebted to them for said sums of money and for the usual commissions on such purchases and sales*, and that, after giving him credit for all which he was entitled to, there was due and owing from Smith to Heath & Quincey, on account of said transactions, on the 2d of October, 1885, the sum of over one million dollars. It then sets out that Smith and his wife, for the purpose of securing the payment of the amount that might be due Heath & Quincey, gave the mortgage on the Fifth avenue house, mentioned in the pleadings, on the 20th of July, 1885, and sets out the assignment by Heath & Quincey to the complainant, and prays a sale of the premises mortgaged, and

that the defendant Smith be adjudged to pay any deficiency which may remain after applying all the moneys applicable thereto.

To this suit Mrs. Smith appeared by one Henry Thompson, an attorney of New York. No answer was filed, but in February, 1886, a stipulation was filed, signed by all the parties, including Mrs. Smith's attorney, by which it was admitted that there was due to the plaintiff, by reason of the transactions set forth in the complaint, a sum of money which would greatly exceed the net proceeds of the mortgaged premises described in the action, and agreed that an interlocutory judgment for the sale of the premises might be entered, and that it might be referred to a referee to compute the amount due the plaintiff from the defendant, for and by reason of the claims set up in the complaint. Upon that stipulation, it was referred to a referee to take an account of what was due, and that referee, by his report, stated that he had been attended by the several solicitors of the parties, including Henry Thompson, the solicitor of the defendants, Henry N. Smith and Mary E. Smith, his wife, and that, in their presence, he had taken the account of what was due. The referee reported that he had examined Mr. McCanless as a witness, and reduced his testimony to writing and made it a part of his report. By his evidence, it appears that Smith employed Heath & Quincey to buy and to sell and to borrow stocks and other securities for his account, *and to advance and pay out for his account all moneys that might be required or necessary for that purpose, and that he agreed to pay, and was accustomed to pay, to said firm a broker's commission of one-sixteenth of one per cent.* upon all transactions made or had by the firm for his account. He further testifies that the accounts between Heath & Quincey and Smith were made up and submitted to Mr. Smith shortly after the 2d of October, 1885, that being the date of the assignment, and that those accounts were gone over, by the direction of Mr. Smith, by his (Smith's) bookkeeper, and all found to be correct; and he makes up a statement showing the amount due, upon which the referee founded his report.

From all this, it appears that the judgment was based upon a

McCanless v. Smith.

claim for *money loaned to Smith and money paid at his request and for commissions,* and that Mrs. Smith was a party to the judgment, and had notice of the proceedings thereon and actually appeared by her counsel before the referee.

It was urged, in reply to this, that Mrs. Smith was not called upon to contest the claim in that suit, since the equity here set up could not have been there administered. Granting that to be so, yet it seems to me that she is estopped from alleging that the judgment was recovered for anything else than money paid and money loaned and services rendered by way of commissions.

But the complainant further answers the position of the defendants, now under consideration, by arguing that it is not competent for a person situate as these defendants are to say that the judgment is void for any cause except that of fraud and collusion between the plaintiff and defendants therein, or that it had no substantial foundation, or that it is founded upon an unlawful consideration, and that this is especially so where the judgment is based upon that of another state.

The position may be more accurately stated thus: The hypothesis being that the complainant holds a judgment against the grantor of defendant, recovered after the conveyance, and asserts that the conveyance was made in fraud of creditors—in such a case he says to the defendant: " Your conveyance is either free from the vice I charge against it, or it is not. If it is honest and for a valuable consideration, then you have nothing to fear from my judgment. If, on the other hand, my charge is true, and you, in fact, hold the land in question by conveyance made in fraud of creditors and in trust for the grantor, then you have no standing to go behind my judgment and inquire into its consideration, unless, indeed (and this is claimed to be the only exception), it is merely a collusive judgment, without consideration, and suffered for the purpose of enabling the debtor to recover his property and accomplish by that indirect means what he could not do directly." This exception, I stop to say, is illustrated by the case of *Anderson* v. *Tuttle & Stewart, 11 C. E. Gr. 144.* There one Tuttle, having judgments against him, caused land to be conveyed to his sister, Mrs.

Stewart, in secret trust for him. Having failed (*Cutler* v. *Tuttle*, *4 C. E. Gr. 549*) to get the title from her, he caused certain judgments against him to be assigned to his brother-in-law, Anderson, who, in Tuttle's interest, filed a creditor's bill against Mrs. Stewart; and it was held that the complainant was a mere trustee for Tuttle and could not have any remedy. In other words, the fraudulent grantee may defend against the fraudulent grantor or any one who claims openly or secretly in his interest, but not against his actual creditor, no matter what may be the foundation of his debt, so long as it be a debt established by judgment *in invitum*. The doctrine of merger precludes all inquiry into or notice of the *character* of the original debt, although, in order to show the date of its origin, such character be incidentally exposed. The original debt, with all its inequities, is merged in the judgment.

This position seems to be sustained by a great weight of authority.

In *Spencer* v. *Brockway*, *1 Ohio 259*, the action was based upon a judgment recovered in the State of Connecticut, founded upon a penalty, and the defence was set up that the Ohio court would refuse to render judgment for the plaintiff on this foreign judgment, on the ground that the State of Ohio was not obliged to enforce the penal laws of the State of Connecticut; but the court held that the point was not well taken and that the court could not go behind the judgment to see upon what it was founded.

In *Thatcher* v. *Gammon*, *12 Mass. 268*, the action was based upon a mortgage, and the defence was usury; and it appeared that the mortgage was given to secure the amount of a judgment recovered by the mortgagee against the mortgagor, and the proof was that the judgment included illegal and usurious interest; but the court held that the plaintiff was entitled to remedy upon his mortgage and that the judgment was conclusive.

The case of *Healy* v. *Root*, *11 Pick. 391*, is similar to the case of *Spencer* v. *Brockway*, *supra*.

In *Christmas* v. *Russell*, *5 Wall. 290*, the case was this: Christmas, a citizen of Mississippi, made his promissory note,

McCanless *v.* Smith.

which came to the hands of Russell, a citizen of Kentucky. After the note was outlawed by the law of Mississippi, Russell procured service of a writ upon Christmas, in Kentucky, and recovered judgment against him upon the note there, then brought suit upon the judgment in the federal court of Mississippi ; and the defendant set up a statute of Mississippi, which provided that no action could be maintained on a judgment of another state, recovered against a citizen of that state, where the cause of action would have been barred by any act of limitation of that state if such suit had been brought there ; and the court held that the statute was unconstitutional and that the judgment of the Kentucky court was conclusive upon the Mississippi court.

In *Mattingly* v. *Nye, 8 Wall. 370,* the case was that Mattingly recovered a judgment against Nye in the court of the District of Columbia and filed a bill to subject to the lien of his judgment lands which Nye had caused to be conveyed to a trustee for the benefit of Nye's wife, and defence was made, among other things, that there was nothing due upon the judgment—that it was recovered by a default, which was due to the sickness of Nye, and that it was tainted with usury. It will thus appear that the case was very similar to the one before the court ; and it was held that the judgment was conclusive and that Mrs. Nye and her trustee could not set up that it was void or founded upon a usurious consideration, the head-note being, "A judgment for money due, at a certain time, against the party making the settlement, is conclusive in respect to the parties to it. It cannot be impeached collaterally and it cannot be questioned upon a creditor's bill."

In *Candee* v. *Lord, 2 N. Y. Ct. App. 269,* the case was this : The complainant obtained judgment against the defendant, Lord, and then filed a bill to set aside certain conveyances made of the debtor's property by virtue of judgments recovered against the debtor prior to the recovery of his (the plaintiff's) judgment, on the ground that those judgments were collusive and contrived for the purpose of putting the property of the debtor out of the reach of his real creditors. The purchasers, by virtue of the

McCanless *v.* Smith.

prior judgments, answered separately and insisted, among other things, that the plaintiff's judgment was obtained in a suit brought against the common defendant, Lord, upon a forged endorsement of a promissory note, and this was insisted upon as a ground of defence to the bill so far as they were concerned. It was held by the court of appeals that such defence could not be set up. In delivering judgment, Mr. Justice Gardiner said: "A debtor may be said to sustain two distinct relations to his property—that of owner, and quasi-trustee for his creditors. As owner, he may contract debts to be satisfied out of his property, confess judgments, create liens upon it, sell or give it to others at pleasure, and, so far as he is personally concerned, will be bound by his own acts. But the law lays upon him an obligation to pay his debts and holds him, in behalf of his creditors, to the exercise of good faith in all transactions relating to the fund upon which they must depend for payment. He can, therefore, neither create a debt nor do any of the things above mentioned *mala fide* to their prejudice. * * * In creating debts or establishing the relation of debtor and creditor, the debtor is accountable to no one unless he acts *mala fide*. *A judgment, therefore, obtained against the latter without collusion, is conclusive evidence of the relation of debtor* and creditor against others. * * * In this case, the defendants have not alleged that the judgment of the complainant was not obtained in good faith. But they insist that there was error in the suit in which it was obtained, in the determination of a question of fact; and that they are not concluded by the defence of the debtor, because they are *not in privity with him. We think otherwise.* The law which gave the judgment debtor the unlimited right (when honestly exercised) to contract debts, to settle and adjust their amount, to secure and to pay them, made him to this extent the representative of all his creditors who should seek the satisfaction of their demands out of his property. So far, at least, they are in privity with, and claim under, their debtor. If, as the defendants insist, they hold the property in question by a title derived under a valid judgment, prior to that of the complainant, their rights cannot be affected by this evidence. If, however, as the

bill alleges, their judgment was fraudulent, the complainant, as
a creditor, can repudiate it and claim the property as that of his
debtor, his acts to the contrary notwithstanding, and hold his
confederates in the fraud accountable as trustees for his benefit.
If the defendants would shield themselves under the maxim,
'*potior est conditio defendentis,*' they should show, or at least
allege, that the complainant is *in pari delicto.*"

To the same effect is *Burgess* v. *Simonson, 45 N. Y. 225,* and
*Carpenter* v. *Osborn, 102 N. Y. 552.*

This late case was peculiar, and is quite in point. The plaint-
iff had recovered five successive judgments in a justice's court
against her husband, John Carpenter, for about $30 each. They
were founded on monthly installments due to her upon a contract
entered into between her and her husband, by which they agreed
to live separately, and he agreed to pay her $26 and a little more
four times a year; and the defence was made that the court
would not aid the plaintiff to recover the money as against her
husband and his fraudulent grantees, because the contract be-
tween them was void as against public policy. Chief-Justice
Ruger said : " The judgments rendered in these actions were, in
the absence of proof of fraud in their procurement, conclusive
evidence not only as against John Carpenter, but also as to all
other persons, of the several questions of fact and law material
to the issues tried, which were thereby determined. The defend-
ants acquired title to the real estate in question from John Car-
penter, and necessarily took it at the risk of any incapacity in
him to convey a good title, and so far as that was affected by the
rights of existing creditors, his fraudulent grantees were equally
bound by such legal adjudications as might be made against him
in respect thereto as John Carpenter himself. It did not, there-
fore, lie open to any of the defendants upon the trial of this
action to contest the validity of such agreement, or the liability
of John Carpenter as a judgment debtor thereon, or the legal
competency of husband and wife to contract with each other, for
those questions were *res adjudicata* and placed beyond the power
of retrial.

" This present action was founded upon the last four judgments

described, and was brought for the purpose of setting aside certain transfers of real property made by the defendant, John Carpenter, to the other defendants, as being fraudulent and void as against his creditors. To entitle the plaintiff to maintain such an action, it was essential that she should establish her character as a judgment creditor of the fraudulent grantor, and the fact that the conveyances challenged as fraudulent were so in fact, and stood in the way of the collection of her judgment. The production and proof of a judgment in her favor, for a sum of money against the debtor, rendered by a court of competent jurisdiction, was, if not impeached for fraud, conclusive evidence in such an action of her character as such creditor. To establish the issue on her part in this action, the plaintiff put in evidence the respective judgment-rolls in the several actions above referred to, and the several executions issued thereon, each of which were severally duly returned unsatisfied. She also proved the written agreement above referred to, and gave evidence tending to show that the several conveyances assailed were voluntarily made by her husband with intent to defraud his creditors, and that the several grantees therein had knowledge of such intent and participated therein. The evidence, we think, sustained the conclusions of fact found by the trial court, which rendered judgment for the plaintiff, and it does not appear to us that any error of law was committed by that court which requires a reversal of such judgment.

" The principal questions presented by the appellants' counsel upon the argument before us, related to the invalidity of the separation agreement of January, 1873, and the incompetency of husband and wife to thus contract with each other. Since we have held that the defendants are precluded from raising those questions in this action, the further discussion of them would be unprofitable and unnecessary."

To the same effect is the text of *2 Black Judg.* § *605*, where many cases are cited.

But the defendants herein went further, and claimed that the court would not aid the complainant to enforce this judgment as against the defendant Henry N. Smith himself on account of the

inequitable character of its consideration; but I think that the judgment and decree in New York, and the subsequent judgment in this state, are entirely conclusive upon that point, and that it does not lie in the mouth of Henry N. Smith to take any such position.

I am unable to discover anything inequitable in the standing of the complainant.

This brings me to the merits, and here the case naturally divides itself into two parts, viz., that relating to the five lots conveyed to Mrs. Smith in 1872 and 1873, and that relating to the seven lots conveyed by Mr. Smith to her in 1885.

The complainant attacks the settlement of 1872 and 1873, on several grounds:

*First.* That its subject was not such a property as was suitable for, or useful to, the wife, but, on the contrary, one which was peculiarly suited to gratify the tastes and desires of the husband, and one which he may have thought he might derive a profit from.

*Second.* That at the time it was made the husband was engaged largely in extremely hazardous operations, and at or about that time increased his ventures and risks and continued them with varying fortune, and with but trifling cessation, until his financial failure in 1885, caused by a turn of fortune against him stronger than he could withstand.

*Third.* That, with the knowledge and acquiescence of the wife, he used the property as his own for his individual purposes, and took the rents and profits, and expended enormous sums of money upon it, and appeared to the world as its owner; that he purchased in his own name adjoining property of greater extent, and obliterated the landmarks between them, and consolidated and merged the two into one large estate; and finally that, at the last, when the question of giving him further credit arose, his creditors actually relied upon his ostensible ownership of this estate and gave him further credit upon it.

With regard to the conveyance of 1885, the complainant says that the alleged consideration was a myth and a sham and that

it was clearly in fraud of his then present creditors, the greater part of whom are represented by the complainant.

The defendant's position as to the *first* is that it was a fair and reasonable settlement, made at a time when the settlor was possessed of a large estate, and as to the *second*, that it was made upon a full and valuable consideration.

I will consider these in their order.

[Here follows a discussion of facts.]

I have said that I thought the complainant had made out by the proofs his contention as to this settlement.

Several matters are urged by the defendants' counsel in support of the settlement, which I will now consider.

*First.* Reliance is placed on the fact that at times during the summer of 1872, when Mr. Smith was speculating so heavily, he had a considerable block—$100,000 or more; the amount was not clearly shown—of stocks and bonds in his own safe, not pledged as collateral for any loan or deposited as a margin on any speculation. Some of these free assets, however, formed part of his special capital in the firm of brokers in which he was a member, and were thus security for all their contracts for him. However that may be, it is plain that a person operating so heavily on so small a margin, and through several different brokers, should, if exercising a proper caution, reserve a fund to be used, as occasion might require, to make up a temporary deficiency in any of his margins resulting from a sudden and, it might be hoped, temporary disturbance of the market. This reserve, kept for this purpose, became as much subject to the risk of the general speculation as if it had been actually pledged with his brokers. The proofs fail to show that Mr. Smith ever withdrew a fund from use in his speculations and invested it permanently and beyond the reach of his temptation to use it in case emergency should require it.

Again, reliance was placed on the fact that he, on one or two occasions, between 1874 and 1885, withdrew from the street and had a fair balance to his credit, and was " out of debt." But I am unable to see the value of this circumstance. Complainant does not rely upon a condition of continued indebtedness, but

upon his devotion to a hazardous practice—I will not say business. This he never gave up, but simply rested a few months, to give tone and strength to his nerves and fit him for further speculations. It is here a question of object, intention and use. I cannot see that either the original object and intention with which he made this so-called settlement upon his wife, or the use which he made of it, ever changed from the time he made it until he finally failed. His apparent ownership continued without interruption.

Again, it was argued that stock brokers do not rely upon the personal responsibility of their clients, but exclusively upon the margin they put up. This is not true in fact. They do, in fact, require and receive the personal contract of their clients to make good all losses, and they do, in point of fact, inquire into and rely upon their personal responsibility. Heath & Company did it in this instance. Brokers generally are obliged to do so, for it is a well-known fact that stocks are liable to fluctuate so suddenly and severely that brokers do not always have time and opportunity to call for more margin, and in case of failure to receive it, sell out or buy in, as the case may be, in time to save themselves. Mr. Back, a partner in several of the broker firms in which Mr. Smith was a special partner, swears that those firms made no money, and assigned as a reason, losses incurred by them through small, irresponsible speculators and dealers.

Again, reliance is placed upon the fact that the settlement of 1872 was published to the world by placing the deeds of conveyance upon the public records, by which it appeared that the title stood in Mrs. Smith's name, and it is argued that Heath & ·Company are chargeable with notice of that fact. This is certainly a circumstance tending to negative fraud. *Sexton* v. *Wheaton, 8 Wheat. 229; Wallace* v. *Penfield, 106 U. S. 262.* It strikes at the very foundation and essence of the fraud necessary to be found in order to make a settlement void as against subsequent creditors, viz., that the settlor and debtor was the apparent owner by possession and control of the settled property, and that creditors were justified in believing him to be the ·owner, and that the wife or other beneficiary of the settlement

held him out to the world as such owner. And if the settled
property be a dwelling suitable and proper for a home for the
wife, the mere occupation by the husband with the wife of such
dwelling, her title being published by the record, is not, ordina-
rily, misleading to persons dealing with the husband. But the
fact that the title stands upon the public records in the name of
the wife or other beneficiary at the time the debt was contracted,
is but a circumstance, and is by no means conclusive against
fraud. It has been so held in many cases. In fact, if the con-
veyance, though made before the debt is contracted, is withheld
from the record until afterwards, and there is no exclusive pos-
session by the beneficiary, it would seem that it would necessa-
rily be held to be effective only from the date of its record, and
not from the date of its execution, and for that reason construc-
tively fraudulent as against the debt in question. So that the
question whether a conveyance by way of a settlement is good
as against subsequent debts of the settlor can rarely arise, unless
it be not only executed and delivered, but actually recorded
before the debt is incurred.

In *Ramsey* v. *Voorhees, 11 Stew. Eq. 282,* two distinct prop-
erties were in dispute, one called the Bound Brook property,
conveyed to Ramsey's wife May 26th, 1879, and, as I infer from
the report, duly recorded at that time, and over two years before
the debt was incurred. The other property was called the Flem-
ington property, and was conveyed by Ramsey to his wife by
deed dated, but not recorded until after the origin of the debt.
The Bound Brook property, as well as the other, was subjected
to the lien of the judgment, on the ground that Ramsey, the
debtor, spent money on it and was its apparent owner. The
case is much like this, and the result was affirmed on appeal.

In *Mellon* v. *Mulvey, 8 C. E. Gr. 198,* the conveyance from the
husband to the wife was recorded as soon as executed, and was
set aside in favor of subsequently-incurred debts, on the ground
that it was given to protect the property from the future debts
of the husband.

In *Gardner* v. *Kleinke, 1 Dick. Ch. Rep. 90,* the conveyance
was also recorded as soon as executed.

McCanless v. Smith.

The reason why the mere publication of the conveyance by placing it upon the public records is not conclusive in its favor as against subsequent creditors, is that business men do not ordinarily examine the records to see whether the title to real estate, of which a trader has possession and is the apparent owner, stands in his name or not, especially if it be of a character not likely to be settled upon his wife. In the case in hand we have a man buying and taking possession and spending large sums of money upon a race-course and its usual improvements, putting on it a stock of stallions and brood mares and engaging in the business of breeding horses. One dealing with him would hardly suspect, under these circumstances, that he had settled all this property, including the stallions and mares, on his wife, and that *she* and not *he* was conducting the business, and hence would not think to examine the records to see where the title stood. I think Heath & Company fully justified in supposing the property in question to belong to Mr. Smith.

Again, it is said that the value of the property settled was not excessive, considering the amount of Mr. Smith's estate. The cost of the New York property settled upon his wife was about $300,000. The cost of the Trenton property, including improvements put on it in December, 1872, was $77,000. The value of the horses given to Mrs. Smith with the farm is not easy to estimate. They cost about $200,000; so that altogether she had nearly $600,000 settled upon her at a time when her husband thought himself worth two millions or more.

But it is not necessary to consider whether the settlement was reasonable in amount or not. The serious objection to it is not to the amount that it cost, but, as before remarked, to its character and the circumstances under which it was made, and the use which was made of it. I can conceive of no motive Mr. Smith could have had in making it except to put it beyond the risk of the fluctuations of the stock exchange, so that, in case of misfortune, he might have it for his own use and benefit. Had he failed in 1872 or 1873, instead of 1885, it seems to me that the transaction would have been quite indefensible. This original inherent vice, which would have subjected the property to the

34

payment of his debts if he had failed at the period just mentioned, was never cured or eliminated by any subsequent act. He never entirely abandoned his hazardous operations, and he continued for years, and up to within a short time before his failure, to expend large sums in permanent improvements upon it, and to use it as his own. All this was done with the knowledge and silent acquiescence of his wife.

Nor does the time which has elapsed cure the defect, since the character of the possession and use did not change. In *Stileman* v. *Ashdown, 2 Atk. 477*, Lord Hardwicke in 1742 set aside a settlement made in 1700 and another in 1708; and in *Taylor* v. *Jones, 2 Atk. 600*, the master of the rolls set aside a settlement in 1743 in favor of a creditor on a judgment recovered in 1741.

For these reasons I think this settlement cannot stand. But if I had come to a different conclusion I should have thought the complainant was entitled to relief, at least as to the permanent improvements put upon the property between 1880 and 1883.

In coming to this conclusion I do not charge Mr. Smith with any actual fraud involving moral turpitude. It is not necessary to do so. I think the observations of Vice-Chancellor Malins in *Mackay* v. *Douglas, L. R. 14 Eq. Cas. (1872) 120*—a case of a subsequent creditor—on this subject are apt. He says that it is not at all necessary to show that a man had any fraudulent intent in making a settlement as the law is now settled. "The statute speaks of cases where the creditors 'are, shall or might be in any wise disturbed, hindered, delayed or defrauded,' and it is not necessary to show an intention to do that, because if the settlement must have that effect the court presumes the intention and will attribute it to the settlor."

Now the fraud in these cases where the debt accrues after the settlement is made consists, as it seems to me, in the fact that the debtor is knowingly permitted by the beneficiary to have the possession, control and apparent ownership of the property settled, so that persons dealing with him are misled by appearances and suppose him to be the owner and give him credit on the faith of such ownership. If that be so, it matters not what may

McCanless v. Smith.

be the motive of the parties. Their conscious acts have worked a fraud, and that is the "actual fraud" requisite in these cases as distinguished from the "constructive fraud" which is presumed in favor of a creditor whose debt accrued before the settlement was made.

*Second.* As to the two hundred and thirty-two acres, composed of seven tracts, purchased by Smith in 1880 and conveyed to his wife July 20th, 1885. It was very properly conceded by the defendants' counsel that this conveyance could not stand without a full consideration, and must be upheld, if at all, because it was given for such. Mr. Smith's margin was exhausted—so swears McCanless—July 1st, 1885, and stocks continued to rise in price so that, on the 20th of July, if all the transactions had been closed out, Smith would have owed the firm nearly $400,000. The mortgages given on that date admit a large indebtedness.

The question then is, Was this conveyance made for a full and valuable consideration?

[Here follows a discussion of facts.]

I believe I have now considered all the matters urged in support of this transfer of 1885, and my conclusion on this part of the case is that the attempt to create a consideration for the conveyance in question fails, except as to the inchoate right of dower, and that is so small in value, and the attempt to commit a fraud is so palpable, that I cannot give Mrs. Smith's estate the benefit of the exception to the rule recognized in *Demorest* v. *Terhune, 3 C. E. Gr. 532,* and allow the conveyance to stand here as a mortgage.

In my opinion, the complainant is entitled to the relief prayed for.

I cannot leave the case without expressing my obligation to the counsel on both sides for the aid which I have received from their very able and exhaustive arguments. If I have fallen into error it is not the fault of counsel.